**MERCURY INS. CO. v. HODGES et al.**

**No. 17442.**

Court of Appeal of Louisiana. Orleans.

Jan. 13, 1941.

Rehearing Denied Feb. 10, 1941.

St. Clair Adams & Son and P. A. Bienvenu, all of New Orleans, for Mercury Ins. Co., appellant.

Jos. F. Monie and James J. Landry, both of New Orleans, for Stanley J. White, appellee.

Prowell & McBride, of New Orleans, for Mrs. Annie H. Hodges, appellee.

JANVIER, Judge.

Mrs. Joseph W. Simon is the owner of a duplex apartment building in the City of New Orleans. It was damaged by fire on July 22, 1936. Mercury Insurance Company, having issued to Mrs. Simon a policy of fire insurance, paid to her the amount of the loss, $515.90, and secured a subrogation under which she transferred to it all her rights against the person or persons responsible for the fire. Proceeding under the said subrogation and seeking reimbursement of the amount which it had paid under its policy, the said insurance company brought this suit against Mrs. Annie H. Hodges, the lessee of the apartment in which the fire occurred, and against Stanley J. White, the contractor, who, at the time of the fire, was engaged in the carrying out of a contract for the refinishing of certain floors in the apartment and who, because of alleged negligence of his employees, is charged by plaintiff with legal responsibility for the loss.

It is alleged that Mrs. Hodges, who occupied the apartment under lease, without the consent of the owner, Mrs. Simon, entered into a contract with White for the scraping, polishing and varnishing of the floors and that the fire resulted from negligence of employees of White during the performance of the work.

Mrs. Hodges maintains that, even if White's employees were negligent and even though this negligence caused the fire, she is not responsible since White was an independent contractor, to whom, directly plaintiff must look. And she also asserts that the work was undertaken with the knowledge and consent of Mrs. Simon and was being done for the mutual advantage of both Mrs. Simon and herself, and she contends that, therefore, neither Mrs. Simon nor her subrogee, the insurance company, may look to Mrs. Hodges for indemnity, even if there was negligence on the part of White, and Mrs. Hodges calls White in warranty, averring that, if there is any liability in her towards Mrs. Simon, White's negligence was the cause thereof.

White denies that there was any negligence on the part of his employees, avers that all such employees were competent and careful, and especially asserts that, if the material with which the floors were being treated caught fire or exploded, the ignition was caused "by a bolt of thunder and lightning", and he maintains that he, therefore, is not legally liable for the results of the said fire or explosion.

In the district court there was judgment dismissing plaintiff's suit against all defendants. This is an appeal from that judgment.

■ Inasmuch as the judge a quo held that there was no negligence in White, we deem it advisable to first consider the evidence concerning the origin of the fire and the circumstances surrounding its ignition in an effort to determine whether there is any liability in White.

It is shown that the floors were being "filled" with a composition made by dissolving a putty-like substance in gasoline and that this composition had been spread on the floor just before the fire started. It is also shown that, though this material had not been spread on the floor of the kitchen, in which there was a stove and an automatic water heater, it had been spread on the floor of the enclosed sleeping porch which adjoins the kitchen, and it appears that the door between that porch and the kitchen was open. Very near to this open door was the automatic water heater, which

was provided with a pilot light which customarily burns at all times, so that, on the drawing of water, the pilot light will ignite the main gas supply as it enters the heater. Whether this pilot light was burning when the inflammable substance was spread on the floor of the adjoining room is one of the crucial questions of fact which must be answered. It is a crucial question because it appears from the testimony of Wilfred Stansbury, one of the principal employees of White and the only one who was in the room when the fire started, that it would have been dangerous to allow the pilot light to burn in the heater while the material was being spread on the floor of the adjoining room. He said that, though "there was no place to see if there was a pilot light burning", he looked as carefully as he could because "I wanted to see the place where there was a pilot light and I would have turned it off."

It is evident that White himself believed that, to leave such a light burning would have been considered dangerous because, in the office of the state fire marshal, when asked whether he did not think it would have been proper to investigate to determine whether the pilot light was burning, he answered: "It is customary for the men filling the floor to look for those things before they start filling the floor."

We consider these statements concerning this heater as evidencing plainly the opinion of these men, who are experts in this line of work, that it is dangerous to spread this material near such a heater without first turning off the pilot light, and we therefore conclude that it was negligence in Stansbury not to make a most careful examination. He finally admitted that he had not ascertained with any certainty whether the light was burning, stating "I didn't know if it was burning or not", and he said that he did not ask "the girl in there if the heater was on". His testimony concerning his efforts to determine whether the light was burning is quite interesting because, when called to the fire marshal's office shortly after the occurrence, he was asked whether the light was burning and he answered: "I didn't know, I hadn't paid any attention", and yet later, at the trial in court, apparently realizing the damaging effect of an admission that he had not made any investigation, he, in a feeble way, attempted to show that he had tried to look into the heater but could not find any opening through which he could look.

White's foreman, Mr. Nuessly, stated that he had not looked at the water heater to see whether any pilot light was burning.

An attempt is made to show that the fire originated just as a flash of lightning illuminated the room and that it (the fire) first made its appearance at a bucket containing this "filler", which was on the floor in the same room and almost directly under an electric light fixture in the ceiling, and, in his testimony given in court, Wilfred Stansbury, though he would not say that the fire originated at the bucket, attempted to make it so appear. But he must have overlooked the fact that sometime before, when he had testified in the office of the fire marshal shortly after the fire occurred, he said that "the fire started behind me near the kitchen door".

We have reached the conclusion that the fire did start near the kitchen door and not at the bucket.

There is, it is true, no positive testimony to show that the pilot light was burning at the time. However, it is shown that earlier on that day hot water had been drawn from the heater and, of course, this is proof that, at that time at least, the pilot light was burning since the gas entering the heater could not have ignited otherwise.

It is also shown that no one in the house had turned off the pilot light between the time at which the hot water was drawn and the time of the commencement of the fire.

Another disputed question of fact is whether the windows of the room were closed, and this, too, is important because it is shown by White that, because of the inflammable nature of the .vapor of the evaporating gasoline, it is not safe to confine this vapor too closely and that, therefore, it is considered best to leave windows open when such a solution is being spread on a floor. When the deputy fire marshal said to White, "Of course you realize what a danger the gasoline is and it can cause fire and cause an explosion especially in a confined room", he answered: "I don't think the fire would have happened if the room had not been confined." The following testimony was given by Nuessly, the foreman of Mr. White:

"Q. Wouldn't you consider the fire and explosion at this house proof that it is a very dangerous proposition? A. Yes, in a closed up place."

And yet there is a preponderance of testimony to the effect that, because of rain, all of the windows had been closed before the filler was spread over the floor.

In the investigation to which we have so often referred, Stansbury also testified as follows:

"Q. While you were at work there, did rain come up? A. Yes, sir, poured down rain.

"Q. And it was necessary for you to pull down the windows? A. Yes, sir."

It will be noticed here that he made no reference to any distinction between the top, or upper windows, and the lower windows. He clearly shows that the windows were closed because of the rain and yet, later, when he testified in court, he seemed to realize the damaging effect of the statement that the windows were closed, and then, for the first time, referred to the top windows, apparently meaning the upper sashes, and said that they had been left open. It is evident, however, that White was told by his employees that the windows had been completely closed because, at the investigation, his answer to the question "On this day, do you know whether this room was closed or not?" was: "It was closed. They said they had to shut all the windows on account heavy rains." It must be noted that there is no reference to any top, or upper windows, or sashes. He merely said that "all the windows" were shut and his foreman, Nuessly, concerning the windows, said, when asked "Do you know whether this room was closed up tight or not?", that "it was closed tight. It happened to be raining about 2:30 and closed up all the windows".

We conclude that there was negligence, then, in two particulars:

(1) In that no care was taken to determine whether the pilot light of the heater was burning when this highly inflammable material was spread on the floor, and,

(2) In that all of the windows were closed when this operation was performed.

We further conclude that the fire was the direct result of these negligent acts and that, consequently, White is responsible for the loss which occurred. And since Mrs. Simon, to whom White became liable because of the result of this negligence, has assigned and transferred all of her rights to the plaintiff insurance company, that company is entitled to a judgment against White just as Mrs. Simon would have been.

We now proceed to a consideration of whether there is liability, also, in Mrs. Hodges, the tenant who had employed White to do the work in the premises of Mrs. Simon.

Plaintiff first maintains that Mrs. Hodges had undertaken to do this work without the consent of Mrs. Simon and from this counsel for plaintiff argue that Mrs. Hodges is liable solidarily with White. They maintain that Mrs. Hodges is liable also because of her contractual obligation—undertaken when she, as lessee, executed the lease—to keep the property in good order during the term of the lease and to return it at the end in like good order, and, going a step further, they assert also that, since it is obvious that this obligation to maintain the property in good order cannot be complied with, Mrs. Simon could have maintained an action against Mrs. Hodges, and, consequently, that the insurance company, as assignee or subrogee, may maintain this action.

Let us first dispose of this last contention, since to do so requires only that we cite a recent decision of our Supreme Court, Transportation Mutual Insurance Company v. Southern Scrap Material Company, 181 La. 1028, 160 So. 800, 802. There property of an owner-lessor was practically destroyed by fire while in the possession of the lessee. The insurer of the owner paid the loss, received an assignment or subrogation, and then brought suit against the lessee, contending, in the first place, that the fire had resulted from negligence of the lessee, and, in the second place, that in any event, because of the fire, the contractual obligation of the lessee to return the property in good order could not be complied with. (This is the exact contention made in this phase of the case at bar.) There the court held that there was no negligence in the lessee and that, therefore, the subrogation or assignment, insofar as it transferred any ex delicto obligation, had transferred nothing. Then the court considered whether the insurance company, as assignee, had any rights under the contract of lease and said: "Nor can plaintiff insurance company sustain a cause of action ex contractu in this case,

for the following reasons: There is no privity of contract whatever between plaintiff insurance company and defendant company, in so far as the lease of the New Orleans Terminal Company to defendant company is concerned. The insurance company is no party to this lease."

We may say the same here because the document evidencing the assignment or subrogation contains nothing purporting to transfer to plaintiff-insurer any contractual rights which Mrs. Simon may have had under the lease contract, even conceding that any such rights arose. The assignment here is limited to the transfer of any rights which Mrs. Simon may have had "arising from such loss * * *" and it transfers no right arising from the contract of lease.

But counsel for plaintiff declare that the record shows that Mrs. Hodges did not have the consent of Mrs. Simon to do the work in which White was engaged and they argue from this that, in undertaking, through White, to do this work, Mrs. Hodges was technically in the position of a trespasser and should be held liable along with White for the results of his negligent acts committed while performing work under contract for her.

This might present an interesting question if the record sustained the contention that Mrs. Simon's permission for the execution of the work had not been obtained before the work was commenced. But we think that the contrary is shown. Mrs. Simon admits that she agreed that Mrs. Hodges might have the "sun parlor" floor done over, but she states that it was her "understanding" that it was only this floor that was to be so refinished. As against this rather indefinite explanation of her "understanding" that only one floor was to be refinished, we find the very positive and definite statement of Mrs. Hodges that all of the floors were unsatisfactory and that, when she told Mrs. Simon that "I wouldn't be willing to take the place another year unless the floors were fixed", Mrs. Simon authorized her to have the work done provided it should be done at her own expense. Not only is Mrs. Hodges much more specific and positive in her testimony, but she has the probabilities to support her because, surely, since the work was being done at her expense, Mrs. Simon would not have been interested in requiring her to limit it to one room, for there is

no doubt that the work, if completed, would have resulted in improving the premises. We believe that Mrs. Hodges had the consent of Mrs. Simon to have the work done.

And now we reach the final argument of plaintiff in support of the contention that, regardless of whether the permission was obtained to do the work, Mrs. Hodges is responsible for the results of the negligence of the contractor engaged by her.

Counsel argue that if a lessee, with the consent of a lessor, undertakes to do work in leased premises and employs a competent contractor to do it, the lessee is responsible for the damage caused by said contractor, and, in support of this statement, cite certain cases, notably Smith v. Female Orphan Asylum, 1 La. 547, and Clark v. Engelhardt, 9 La.App. 334, 120 So. 498. Each of these cases involves, not work done by a lessee resulting in damage to property of the lessor, but work done by a lessor resulting in damage to property of the lessee. Counsel for plaintiff ask, however: "Can it be contended that under such circumstances the obligation of the lessee is not as great as the obligation of the lessor?" And we find ourselves unable to see any distinction. It would seem logical to hold that, if a lessee, without the consent of the lessor, undertakes to make alterations or repairs and, in so doing, causes damage to the property of the lessor, he should be held liable even though he may have employed a competent independent contractor to do the work.

But the situation is vastly different where the parties, by agreement and knowing that a contractor must be employed, stipulate that work shall be done by a "competent" contractor and—as here—it is conceded that the contractor engaged was competent. Here the circumstances surrounding the employment of the contractor are not in dispute. Mrs. Hodges was already a tenant of Mrs. Simon and they discussed the question of a new lease. Mrs. Hodges stated that she would not take the premises unless the floors should be done over; Mrs. Simon said that she was not willing to do over the floors and wanted an increase in rent. It was finally agreed that Mrs. Hodges should pay a slightly increased rental and that she might do the floors over at her own expense and Mrs. Simon said that she agreed to this "if she employed a reliable man", and,

when asked why it was that she required that Mrs. Hodges employ a competent man, she answered: "Well, to safeguard from any trouble, you usually want somebody reliable to do your work."

It is shown that White is regarded as one of the most competent men in that particular line of business. When Mr. McCarthy, another contractor, was questioned concerning the skill of White, counsel for plaintiff interrupted to say: "Well, there is no denial of that. My own witness has testified that White was a competent man."

That there is a clear judicial recognition of the distinction between the liability which may result when no consent is obtained, and the absence of liability when consent has been secured, is evident. In Smith v. Female Orphan Asylum, supra— relied upon by plaintiff—the holding that the lessor was liable resulted solely from the fact that no consent had been obtained from the lessee. In its statement of facts the Supreme Court said: " * * * The defendants admitted the lease and removal of the roof, but contended that the repairs were indispensable, and made at the instance and request of the plaintiff. * * * "

Later in its opinion the court said:

"A defence, however is set up, based on an alleged acquiescence and consent of the tenant that the roof might be removed at the time wnen the workmen were about to take it off. The answer contains also a plea in reconvention for the value of the rent.

"This defence, if supported by the testimony, would relieve the appellants from any obligation to make good the loss sustained by the appellees."

So that, as we view this case, it rather supports the contention of Mrs. Hodges that, where consent is obtained and the work is done by a competent contractor, there is no liability.

In Cross v. Breland, La.App., 185 So. 542, also relied upon by plaintiff, it was contended that, because of the employment of an independent contractor, the lessor was not responsible for damage caused to the effects of the lessee, and it was further contended that the work had been undertaken with the consent of the lessee. We upheld the contention that, since consent had been given, there was no liability.

Nor do we consider Clark v. Engelhardt, supra, as analogous, even conceding that no distinction may be based on the fact that there the lessor undertook to do work and damaged property of the lessee, whereas here it was the lessee who undertook the work. In that case, the lessor, by the contract of lease, was obligated to paint certain walls. He employed an independent contractor, and, through the negligence of this contractor, furniture of the lessee was damaged. The real reason for the result reached by us there was the finding that, when Engelhardt undertook to refinish the walls of the apartment, he did so not because of an agreement made between him and Clark when there was no obligation on his part to do so, but as the result of an obligation previously assumed by him when the lease was entered into. We stated in our opinion that, when the lessor, Engelhardt, took steps to refinish the walls, he only acted "as he was obligated to do, under the terms of the lease with plaintiff". We stated that "The question presented here is whether a landlord, who has obligated himself in a lease contract with his tenant, to make repairs, is responsible for the careless execution of the repairs by the agent of an independent contractor". [9 La.App. 334, 120 So. 499.] We readily understand that, after a lease is already in existence and when there is no contractual or legal obligation to do any alterations, or to do any refinishing, if one of the parties prevails on the other to do such work, or to permit such work to be done, and they both know from the nature of the work that a contractor must be employed to do it, then, if damage results from negligence of a competent contractor, there is no liability in the one who employs the contractor. It seems equally reasonable to hold, as we did in Clark v. Engelhardt, supra, that if, by law or by contract, there is imposed on either of the parties an obligation to make such alterations, or to do such refinishing, the fact that an independent contractor has been employed to do the work will not relieve the party employing the contractor from liability for the results of the negligence of the said contractor. In that case we said: "It has also been held that, where a landlord is under a legal obligation to make repairs, he cannot escape responsibility for injury to tenant's goods by showing that

the damages were caused by the independent contractor. 'The covenant of the defendant, in the lease, to repair is a personal one, the performance of which it could not delegate to another so as to absolve it from liability for damages resulting from the negligent performance of the duty'. Eberson v. Continental Investment Co., 118 Mo.App. 67, 93 S.W. 297."

The distinction is plainly recognized in Lasker Real-Estate Association v. Hatcher, 28 S.W. 404, in which the Court of Civil Appeals of Texas said: "* * * We believe, however, that there is no principle of law which will prevent a landlord and tenant from making a special contract, by which needed repairs for their mutual accommodation are to be made by an independent contractor to be employed by the former, in cases where, as in this instance, the landlord is under no obligation to have them made, independent of such subsequent contract, and that in such case, as both parties are to be benefited by the work of the contractor, they should look to him, and not to each other, for compensation for damages caused by his negligence."

Here, except for the agreement contemplating this particular work, there was no obligation in Mrs. Hodges to undertake it. This particular agreement contemplated that a competent contractor would be employed and we think that the only duty imposed upon Mrs. Hodges was to take care to select such a competent contractor.

We, therefore, believe that there is no liability in Mrs. Hodges at all.

It is therefore ordered, adjudged and decreed that the judgment appealed from, insofar as it rejects plaintiff's demand against Stanley J. White, doing business under the trade name of White Floor Company, be and it is annulled, avoided and reversed, and that there now be judgment in favor of plaintiff and against the said Stanley J. White, doing business under the trade name of White Floor Company, in the sum of $515.90, with legal interest from judicial demand and for costs.

And it is further ordered, adjudged and decreed that, in all other respects, the judgment appealed from be, and it is, affirmed.

Reversed in part; affirmed in part.